Bernard Ryan, P. J.
The contract by which claimant partnership agreed to supervise four certain Thruway construction contracts differs, in its terms, from that which we considered in another suit by this claimant, Claim No. 34769, recently decided. (Tippetts-Abbett-McCarthy-Stratton v. New York State Thruway Auth., 27 Misc 2d 506.)
In Claim No. 34769, the provision was: “ 2. The engineers shall provide to the satisfaction of the chairman or his duly authorized representatives acting through the District Engineer of District No. 8, engineering supervision and inspection services until the completion and final acceptance of the contract ’ \
In this claim, No. 34771, the provision was: “ 2. The engineers shall provide to the satisfaction of the chairman or his duly authorized representatives, engineering supervision and inspection services during the entire term of the contracts as originally established and during such additional periods of time as may be covered by extensions of time granted thereunder, until the completion and final acceptance of the CONTRACTS ’ \
The stipulation that claimant was to provide its services during the additional periods of time, thus expressed, would *534 seem, at first hand, to be conclusive herein. There was moreover, in this contract, a further stipulation: “ 2.1 The engineers are on notice that no additional fee is payable under this agreement for supervision and inspection services performed during additional periods of time covered by extensions of time under the contracts.”
But all contracts must be carried out according to the contemplation of the parties. If performance is delayed through the fault of the one to whom the service is to be rendered, he may be liable to the other for resulting losses incurred by him. This court, upon settled law, has often held that where the State of New York permits a general contractor to fail to progress his operations, and interference with the work of another contractor results, the latter may recover against the State. Without citing cases we recognize that the same principle may be applied to the Thruway Authority. Upon that theory, we directed an award against it in Claim No. 34769. We therein held that inasmuch as the defendant alone had the power to impose sanctions against the general contractor it could not require the claimant to stay on the job" indefinitely without incurring liability for compensation.
Despite the fact that the clauses of the contract between claimant and defendant, above quoted, are, concededly, more restrictive than that which was contained in the contract between the same parties which was in suit in Claim No. 34769, the defendant may be liable herein if any act on its part can be construed as interference with the performance by claimant of this contract.
Claimant was engaged to supervise four projects. The first of the four contracts was known as H. T. 55-4. It was made by the Thruway Authority with the United States Steel Corporation, American Steel and Wire Division, Cyclone Pence Department. It was dated June 17, 1955 and had a completion date of August 1, 1955. But the site of the work was not made available promptly; specifications were changed by the Thruway Authority; work was not commenced until January 25, 1956; then weather conditions were adverse. Extensions were granted to April 1, 1956, to May 15, to June 1, to June 11. Claimant had received a letter of intent dated June 23, 1955. It commenced supervision of the work on January 25, 1956. The work was completed June 8, 1956. It was accepted November 13, 1956.
The second contract was known as H. T. 55-6 and was made with Yonkers Contracting Co., Inc. It was dated September 26, 1955 and had a completion date of July 1, 1956. It provided *535 for grading, paving, sodding and seeding in and about a Thruway service area where another contractor, Chiappinelli-Marx, was to build the gasoline station and restaurant. Claimant was engaged to supervise the Yonkers contract but not the Chiappinelli-Marx contract. Yonkers started work on September 25 under claimant’s supervision. When various structural complications developed with respect to building the gasoline station and restaurant which deprived Yonkers of the site of its work, claimant recommended to the Thruway Authority that extensions be granted. In its letter to him claimant requested the Chief Engineer of the Thruway Authority to charge engineering costs against the contractor corporation which caused the delay. Extensions to Yonkers were granted to November 1,1956 and to May 1,1957. The work under the Yonkers contract was completed April 24, 1957. It was accepted May 23, 1957.
The third contract was H. T. 55-7 with Anchor Post Products, Inc. It provided for 12 miles of fencing. It was dated October 13,1955 and had a completion date of January 1, 1956. Claimant received a letter of intent dated October 5, 1955 and accepted the assignment October 19, 1955. It began supervision of the Anchor contract on November 14, 1955. Anchor ran into trouble. Right of way lines were not determined in some instances; there were changes in fence location; changes were ordered in some of the materials originally specified and they were replaced by others. In these circumstances Anchor requested and received extensions to June 15, 1956 and to October 5,1956, on which date its work was completed.
The fourth contract bore two numbers, H. T. 55-9 and S. W. C. 55-1. It was made with D. Alper Co., Inc., and provided for the work of installing guide railing. It was dated November 30,1955 and had a completion date of December 15,1955. Claimant commenced supervision November 29, 1955. In June, 1956 claimant reported that Alper persisted in prosecuting its work at a slow and intermittent pace. In spite of this contractor’s failure to expedite its work, the defendant extended time of completion to April 15,1956, then to August 1,1956. The work was completed August 3, 1956 and accepted September 28, 1956.
Claimant’s contract was dated January 10, 1956 and was signed and acknowledged by the claimant on that day. After approval as to form by the Attorney-General and upon recommendation of the Chief Engineer and of the Director of Finance, both officers of the Thruway Authority, it was signed and acknowledged by the defendant on January 26, 1956. Prior to January 10, 1956, claimant had received a letter of intent covering H. T. 55-4, had begun supervision of H. T. 55-6, of *536 H. T. 55-7 and of the contract which bore two numbers, H. T. 55-9 and S. W. C. 55-1. In three of the projects, viz., H. T. 55-4, H. T. 55-7 and H. T. 55-9-S. W. C. 55-1, the completion date for the work prescribed had already passed before claimant signed its contract.
Claimant’s theory of damages is notable. It asserts that it lost money in carrying out the supervision contract anyway but proposes that it should bear all losses incurred up to July 1, 1956. It estimates that its losses to that date were in the net amount of $13,230.66. Its actual costs up to April 24, 1957, when the Yonkers contract was completed, were $40,459.35, according to the testimony. Claimant credits against that sum the gross fee it received under the terms of its contract, its remuneration, on a percentage basis, being $19,391.92, and asserts that it sustained a net estimated loss of $21,067.43. On this basis, claimant asks this court to award it the sum of $7,836.77 ($21,067.43 less $13,230.66).
The figures presented to us, both as actual costs and as estimated losses, are in lump sums for field salaries, field overtime, paving inspectors, office salaries, etc., covering all four construction contracts. Although, - as computations, they are in no way controverted by the Attorney-General, who rests solely upon the quoted language of the contract as a bar to recovery, it is not possible for us to break them down and ascertain what damages claimant may have suffered in respect to any particular one of the four projects it supervised. This is important for the following reasons: Claimant implicitly admits that the extensions of time of completion of contract H. T. 55-9 to August 3, 1956 and the extension of contract H. T. 55-7 to October 5, 1956 were not unreasonable, and, as noted hereinabove, contract H. T. 55-4 was completed June 8, 1956, well before claimant’s cut-off date of July 1, 1956. Thus, when we eliminate from our consideration the three contracts last mentioned we must turn our attention to contract H. T. 55-6, the Yonkers contract, if we are to ascertain if claimant has really sustained damages at the fault of the defendant and, if so, to what degree.
As we have already remarked, extensions to Yonkers were granted by the Thruway Authority upon the recommendation of the claimant. The correspondence and other evidence establishes that Yonkers was unable to proceed with its grading, paving, sodding and seeding because the site of its work was not available due to delays in the work of Chiappinelli-Marx, the contractor engaged in building the gasoline service station. But the contract with Yonkers contained certain provisions which are important. We quote from Exhibit 17:
*537 SPECIAL NOTES (OVERLAPPING WORK) *
(Thru ways)
The Contractor’s attention is specifically directed to the fact that because of the work on other contracts within and adjacent to the limits of this contract he may not have exclusive occupancy of the territory within or adjacent to the limits of the contract.
The Contractor’s attention is further directed to the fact that during the life of this contract the owners and operators of Public Utilities may make changes in their facilities. These changes may be made by the Utility employees or by contract within the limit or adjacent to this contract and may be both temporary and permanent.
The Contractor will be required to cooperate with other Contractors and the owners of the various utilities and to coordinate and arrange the sequence of his work to conform with the progressive operations of the work already under contract and to be put under contract. Cooperation and adjustments with the Contractors already engaged and to be engaged upon the site is essential to properly coordinate the construction efforts of all Contractors, Utility owners, and Sub-contractors engaged in the work within and adjacent to the construction area of this contract.
The Contractor shall be responsible for the coordination of the work of his various Sub-contractors. Their respective operation shall be arranged and conducted so that delays will be avoided. Where the work of the Contractor, or Sub-contractors, overlaps or dovetails with that of other contractors, materials shall be delivered and operations conducted so as to carry on the work continuously in an efficient and workmanlike manner. Delays or oversights on the part of the Contractor or Subcontractors or Utility owners in getting any or all of their work done in the proper way thereby causing cutting, removing and replacing work already in place, shall not be the basis for a claim for extra compensation.
In ease of interference between the operations of the Utility owners and different Contractors, the District Engineer will be the sole judge of the rights of each Contractor and the sequence of work necessary to expedite the completion of the entire project, and in all cases his decision shall be accepted as final. The Contractor agrees that he has included in his unit prices bid for the various items of the contract the additional cost of doing the work under this contract because of the fact that he does not have a clear site for the work and because of interference of roadway use, other Contractors and necessary utility work, and the necessity or desirability of opening certain sections of pavement to traffic before the entire work is completed.
Delays in availability of any part of the site or any delays due to interference between the several Contractors and the Utility owners shall be compensated for by the Chairman of the New York State Thruway Authority solely through granting an extension of time in which to complete the work of the contract without Engineering charges.
The Contractor in submitting his bid hereby agrees,that he shall have no other claim against the State of New York or the New York State Thruway Authority for any damage due to such delays or interference other than extended time in which to complete the work.
GENERAL NQTES
FAMILIARITY WITH ADJACENT CONTRACT
Each bidder, previous to submitting a bid on the Contract shall familiarize himself with the provisions and requirements of all contracts, let or to be let, *538 which will, in any way, affect the work under this Contract. The work under this contract shall be carried on simultaneously and in conjunction with the work being performed by others under the above-mentioned contracts.
These provisions of the Yonkers contract were known to the claimant before it executed its agreement with the Thruway Authority and are incorporated into such agreement by reference. Moreover, claimant’s own contract contemplated extensions of the completion date, if required, without extra compensation.
Applying the principle to which we alluded at the outset of our discussion, to the effect that if performance of a contract is delayed through the fault of the one to whom the service is to be rendered he may be liable to the performer for resulting losses, we reach the conclusion here that claimant may recover only upon proof that the Thruway Authority, through its acts or omissions, permitted Chiappinelli-Marx to fail to advance its work. This has not been shown. We have before us only statements that its trenches were open on the site, that its progress was “painfully slow” and inferences that it was at fault. But this does not satisfy. On the one hand the corporation constructing the service building may have been incompetent, its force too small or inefficient, its equipment inadequate. On the other hand there may have arisen contingencies such as inclement weather, scarcity of materials, strikes or other incidents beyond its control, which may have presented reasonable excuses for the delay on its part.
But we may not speculate. We find insufficient evidence upon which to base a finding that the Thruway Authority permitted Chiappinelli-Marx to delay unreasonably or to do any other thing which interfered with the progress of Yonkers and, in turn, resulted in a breach of the Tippetts-Abbett-McCarthy-Stratton contract. Therefore the third cause of action must be dismissed.
The basis of our dismissal is explained hereinabove. It may be remarked, however, that the proof of damages offered is too vague for us to determine to what extent, if any, claimant’s costs of supervision were increased beyond July 1,1956, or what proportion of the fee paid to claimant should be credited against any costs incurred beyond that date.
Awards of earned interest are made upon the first, second and fourth causes of action as directed by the adoption of proposed findings.